IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge S. Kato Crews

Civil Action No. 1: 21-cv-02122-SKC

SUN WELL SERVICE, INC., a North Dakota Corporation,

    Plaintiff,

v.

BERKLEY NATIONAL INSURANCE COMPANY, an Iowa Corporation,

    Defendant.

---

ORDER RE: MOTION FOR SUMMARY JUDGMENT (DKT. 57)

---

This lawsuit involves a coverage dispute between an insured, Plaintiff Sun Well Service, Inc. (Sun Well), and its insurance carrier, Defendant Berkley National Insurance Company (Berkley). Sun Well sued Berkley seeking a declaration that Berkley was responsible for covering an oil field incident and breach of contract damages for its related litigation and settlement costs. Dkt. 9 at ¶¶73-91. Sun Well also brings common law and statutory claims for bad faith. *Id*. at ¶¶92-107. Berkley filed its Motion for Summary Judgment (MSJ) (Dkt. 57), which is fully briefed and ready for decision, seeking summary judgment on all claims. The Court has jurisdiction under 28 U.S.C. § 1332(a)(1).

1

The Court has reviewed the Motion and related briefing, the attached exhibits, the entire case file, and the relevant law. No hearing is necessary. For the following reasons, Berkley's MSJ is DENIED.

## UNDISPUTED MATERIAL FACTS

Berkley is the underwriting entity that issued an Energy Commercial General Liability Policy (Policy) to Steel Energy Services, Ltd. (Steel Energy), policy No. EGL002080210, with a $1,000,000/occurrence limit. Facts, ¶1.[1] The Policy names Sun Well, among others, as Named Insureds under the Policy. *Id.* at ¶2.

Several provisions of the policy are relevant to the MSJ. The Policy contains notice provisions whereby, "[i]f a CLAIM is made or SUIT is brought against any INSURED, [Sun Well] must: a. Immediately record the specifics of the CLAIM or SUIT and the date received; and b. Notify us and see to it that [Berkley] receives written notice of the CLAIM or SUIT as soon as practicable." *Id.* at ¶4; Dkt. 58-1 at 28. Additionally, "[Sun Well] and any other involved INSURED must: a. Immediately send [Berkley] copies of any demands, notices, summonses, or legal papers received in connection with the CLAIM or SUIT[.]" Facts, ¶5; Dkt. 58-1 at 28. In what the parties refer to as the "no-voluntary-payments provision," the Policy provides that "[n]o INSURED will, except at that INSURED's own cost, voluntarily make a

---

[1] Citations to "Facts, ¶___" are to the Reply to Statement of Undisputed Material Facts (Dkt. 68) prepared by the parties in accord with this Court's Standing Order for Civil Cases. *See* Crews Standing Order for Civil Cases, § C.4.c. The Court finds the following facts undisputed for the purposes of deciding the MSJ.

2

payment, assume any obligation, or incur any expense, other than for first aid, without consent of [Berkley]." Facts, ¶6; Dkt. 58-1 at 28. As a limit on coverage, the Policy excludes "BODILY INJURY or PROPERTY DAMAGE expected or intended from the standpoint of the INSURED[.]" Facts, ¶7; Dkt. 58-1 at 28.

On June 20, 2017, Sun Well employee, Joshua Lawson, dropped a pipe downhole at the Furhman 36-162-99H well (the Occurrence). Facts, ¶8. At the time of the Occurrence, Sun Well was performing operations for SM Energy Company (SME), pursuant to a Master Service Agreement (MSA). *Id*. at ¶9. On June 22, 2017, Sun Well emailed Steven Morton, among others, notice of the Occurrence, at which time Berkley opened a claim file. *Id*. at ¶¶12, D2.[2] Sun Well stated that:

> The very interesting thing about his claim is that the employee intentionally pulled the slips. This employee gave use [sic] one-week notice exactly one week prior the [sic] incident. We believe is [sic] was his parting shot at us. I believe the correct word is "sabotage–deliberate act of destruction."

*Id*. at ¶¶13, D6.

Mr. Morton and David Archambault of Berkley Oil & Gas, among others, handled the claim for Berkley. Facts, ¶11. On or around June 23, 2017, Berkley informed Sun Well that Berkley had retained David Watson of Southern International Company to assist Berkley as a "further part of [Berkley's]

---

[2] Facts deemed undisputed for the purpose of resolving the MSJ from Defendant Sun Well's additional undisputed material facts are indicated with a "D" before the paragraph number.

3

investigation[,]" and that Mr. Watson would contact Sun Well directly, and Mr. Watson's responsibilities included reviewing and providing his comments to actual and estimated costs associated with the damaged well. *Id.* at ¶D16. Berkley's investigation included review of the MSA between Sun Well and SME. *Id.* at ¶24. Under the MSA, if Mr. Lawson acted intentionally or with willful misconduct and/or with gross negligence during the Occurrence, Sun Well would have had an obligation to indemnify SME for the damages to the well. *Id.* at ¶D13.

At the time of the Occurrence, Stewart Peterson worked for Steel Energy as the Director of Northern Operations, and he is currently Steel Energy's President and CEO. Facts, ¶14. On February 6, 2018, SME sent an email to Mr. Peterson stating: "Our accounting/auditors asked for a formal letter stating Sun Well Services is assuming liability for the job and P&A costs. Can your team get me a letter?" *Id.* at ¶ 16. On February 9, 2018, Mr. Peterson sent a letter on behalf of Sun Well to SME wherein Sun Well assumed liability for the costs that SME incurred on the well as a result of the Occurrence, including costs to plug and abandon the well. *Id.* at ¶18. The letter also stated that Sun Well had started a claim with Berkley and "Berkley Insurance will be processing the claim and reimbursing Sun Well Service for all approved costs pertaining to the [Occurrence.]" *Id.*

On February 12, 2018, Mr. Archambault had a conference call with Mr. Peterson, among others, and advised that more information was needed to determine exactly what damages were being claimed by SME and that Berkley had the MSA

4

reviewed and none of the damages known up to that point were potentially covered per the MSA. *Id*. at ¶22. Mr. Archambault was still considering paying the claim and had not yet decided to deny or disclaim coverage. *Id*. at ¶D18.

On April 25, 2018, Berkley sent a coverage position letter to Mr. Peterson and Steel Energy's counsel (Coverage Letter). Facts, ¶23. In the Coverage Letter, Berkeley denied indemnity for the pre-suit claim. *Id*. at ¶24.

Mr. Lawson provided a statement, signed June 18, 2018, stating that he did not intentionally cause the Occurrence. Facts, ¶26. On June 19, 2018, Berkley informed Sun Well's insurance broker that Mr. Lawson claimed that he did not intentionally drop the pipe and, as such, the indemnity provisions in the MSA controlled. *Id*. at ¶28.

On May 20, 2019, counsel for SME sent a letter to Berkley about SME's claim against Sun Well seeking a copy of the Policy. Facts, ¶30. SME then sued Sun Well (SME Lawsuit). *Id*. at ¶31. On June 3, 2019, counsel for SME provided a courtesy copy of the original complaint in the SME Lawsuit, filed on May 29, 2019, to Mr. Peterson. *Id*. On June 12, 2019, Sun Well was served in the SME Lawsuit. *Id*. at ¶34. On October 4, 2019, the trial court in the SME Lawsuit entered a default judgment against Sun Well in the amount of $774,095.34. *Id*. at ¶36. On November 19, 2019, SME's counsel sent Berkley a letter advising of the default judgment and demanding payment of the same. *Id*. at ¶37. On January 3, 2020, someone working on behalf of Berkley ordered and received a copy of the original complaint from the SME Lawsuit.

*Id.* at ¶D23. Mr. Archambault wrote, "we will do nothing unless Sun Well tenders to us." *Id.* at ¶24.

On January 21, 2021, the Colorado Court of Appeals vacated the default judgment in the SME Lawsuit. Facts, ¶41. In April, May, and June 2021, Sun Well's and SME's respective counsel discussed selecting a mediator and setting dates for mediation. *Id.* at ¶47. After learning about these discussions, on three separate occasions Berkley asked that Sun Well postpone the mediation sessions scheduled to occur in June 2021. *Id.* at ¶51. But Sun Well's coverage counsel declined to do so. *Id.* at ¶52. During the mediation on June 18, 2021, Sun Well's representative contacted Mr. Archambault and asked if Berkley would be willing to waive the Policy's no-voluntary-payments provision. *Id.* at ¶53. That day, Mr. Archambault responded that Sun Well still had not tendered the SME Lawsuit to Berkley for defense and Berkley would not waive any provisions of the Policy. *Id.* at ¶54. This first day of mediation was unsuccessful.

On June 21,2021, Sun Well's counsel emailed Berkley about a second day of mediation scheduled for June 24, 2021, requested Berkley's participation in the mediation, and renewed its request for Berkley to waive the no-voluntary-payments provision in the Policy. Facts, ¶60. On June 23, 2021, Mr. Archambault responded by asking that the mediation be postponed and reiterated that Berkley would not waive the no-voluntary-payments provision. *Id.* at ¶61. On June 23, 2021, Berkley issued a

reservation of rights letter to Sun Well and agreed to participate in Sun Well's defense, subject to a full reservation of rights. *Id*. at ¶62.

On the second day of mediation, Sun Well settled with SME. Facts, ¶65. Berkley did not consent to the settlement. *Id*.

## STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994). "[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)).

## ANALYSIS

Berkley argues that it is entitled to summary judgment for three reasons. Dkt. 57 at 1-2. First, Berkly asserts that Sun Well violated the no-voluntary-payments provision when it accepted liability for the Occurrence and when it settled SME's claims without permission from Berkley. Second, it asserts that Sun Well failed to properly tender the SME Lawsuit to Berkley for defense such that it is absolved of liability. Finally, Berkley requests that the bad faith claims be dismissed if the

7

underlying claims for coverage be dismissed because there cannot be bad faith in the absence of coverage. The Court addresses each of these arguments in turn.

### 1. Violation of the No-Voluntary-Payments Provision

Berkley asserts that both Mr. Peterson's letter and the mediation settlement violated the no-voluntary-payment provision's bar on assuming obligations without the insurance company's approval. Dkt. 57 at 11-15. Berkley argues that, if it can show the provision was violated, there is no liability regardless of whether it was prejudiced by the violation. *Id.* at 10 (citing *Travelers Property Cas. Co. of America v. Stresscon Corp.*, 370 P.3d 140, 141 (Colo. 2016)).

Sun Well does not dispute Berkley's interpretation of the no-voluntary-payment provision or the assertion that Berkley need not show prejudice under these circumstances. Dkt. 65 at 10-18. Instead, with respect to Mr. Peterson's letter, Sun Well argues that Berkley had consented to assumption of liability by virtue of accepting the claim. *Id.* at 12-13. Regarding the mediation settlement, Sun Well argues that it was relieved of the obligation by Berkley's denial of coverage and by Berkley's unreasonable refusal to waive the provision. *Id.* at 13-16. The Court finds that Sun Well has raised a genuine dispute of material fact concerning whether Berkley consented to acceptance of liability and indicated it denied coverage.

#### A. Mr. Peterson's Letter Accepting Liability

Sun Well asserts the evidence "demonstrates that between September 2017 and January 2018, Berkley, by way of its claim adjusters, Steve Morton, David

8

Archambault and David Watson, communicated to Sun Well that the well damages would be covered under the Policy." Dkt. 65 at 11. In support of this proposition, Sun Well relies on alleged assurances it received that the claim would be covered. First, it argues that, "[o]n September 17, 2017, Mr. Morton advised Sun Well's insurance broker that Berkley would be willing to pay the claim if the amount of payment was 'within reason.'" *Id.* at 12 (citing Facts, ¶19). The evidence in the record does not support this assertion. *Cf.* Dkt. 66-5 at 49 ("[Morton] advised him that Berkley could make no commitments until knew (sic) what was being proposed and if within reason.").

Second, Sun Well relies on an alleged discussion between Mr. Peterson and Mr. Watson, who was brought in to "assist Berkley in the claim adjustment process by reviewing actual and estimated costs and invoices." Dkt. 65 at 12 (citing Facts, ¶¶11, D16). Mr. Watson sent Mr. Peterson an email stating that Mr. Archambault had called him and that Berkley was "anxious to get this claim moving forward and resolved.'" Facts, ¶19; *see also* Dkt. 66-9 at 1. Mr. Peterson also testified that he "had been told by a representative of Berkley Insurance [David Watson] that a claim would be processed, and there were compensable reimbursement for damages." Facts, ¶19; Dkt. 58-6 at 6-7 (Peterson Tr. 73:25-74:3).

Berkley attacks this evidence as insufficient to create a genuine issue of material fact. Berkley asserts that it is inadmissible hearsay and that Mr. Watson had no authority to represent Berkley. Dkt. 67 at 2. But Berkley cites no evidence

9

supporting this proposition. *Id.*; *see also* Facts, ¶19 (citing no evidence in relation to Mr. Watson's role). The undisputed facts concerning Mr. Watson's role are Mr. Peterson's identification of him as Berkley's "representative" and Sun Well's additional undisputed fact that Berkley retained him from another company for the investigation and that he "would contact Sun Well directly" with responsibilities, including "reviewing and providing his comments to actual and estimated costs associated with the damaged well." Facts, ¶¶19, D16. On this record, there is not enough information to determine the admissibility of Mr. Peterson's testimony. Fed. R. Evid. 801(d)(2).[3]

Next, Berkley asserts that "Mr. Peterson's self-serving testimony is directly contradicted by the actual documentary evidence, which reduce Mr. Peterson's sound bytes to legally no evidence." Dkt. 67 at 2 (citing *Vail Summit Resorts, Inc. v. Zip-Flyer, LLC*, 18-CV-01763-MEH, 2020 WL 4287196, at *6 (D. Colo. July 27, 2020)). The Court respectfully disagrees. Mr. Peterson's letter to SME indicating that he believed the claim would be paid shortly is consistent with his testimony. Facts, ¶18;

---

[3] Berkley notes that Mr. Watson is not an employee of Berkley, but the undisputed facts associate all named individuals responsible for Berkley's handling of the claim with entities other than Berkley. Facts, ¶11 ("Steve Morton and David Archambault of Berkley Oil & Gas"). Ultimately, even if Berkley could show Mr. Watson lacked actual authority, the issue of apparent authority would remain. See *Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 565 (1982); *Jaeger v. W. Rivers Fly Fisher*, 855 F. Supp. 1217, 1220 (D. Utah 1994); *Downhole Stabilization Rockies Inc. v. Reliable Field Servs. LLC*, No. 15-CV-226-J, 2017 WL 3477744, at *3 (D. Wyo. Feb. 22, 2017) (denying request to strike alleged hearsay in relation to motion for summary judgment because it related to apparent authority).

Dkt. 68-14 at 6. The Court finds that Sun Well has raised a genuine issue of material fact regarding whether Berkley accepted coverage.

## B. The Mediation Settlement

Sun Well asserts that Berkley cannot enforce the no-voluntary-payments provision with respect to the mediation settlement because Berkley disclaimed coverage in its April 2018 Coverage Letter. Dkt. 65 at 13. It argues that, "when an insurer repudiates its contractual obligation to pay under an insurance policy, it forfeits its right to enforce the terms and conditions of its policy, including the voluntary payments/consent provisions, because the insurer cannot 'resurrect the insurance contract' after it disclaims coverage." *Id.* (quoting *Phillips v. New Hampshire Ins. Co.*, 263 F.3d 1215, 1223 (10th Cir. 2001)); *see also Franklin v. Oklahoma City Abstract & Title Co.*, 584 F.2d 964, 968 (10th Cir. 1978) ("Furthermore, provisions prohibiting out-of-court settlements between an insured and a claimant without the consent of the insurer are not enforced when the insurer repudiates coverage or denies liability." (citations omitted)).

Berkley replies that its letter is not an "outright denial" of coverage and that "nowhere in the [Coverage Letter] is there a statement that [Berkley] would not provide a defense to Sun Well if a lawsuit were filed against it." Dkt. 67 at 5. Regardless of whether Berkley is correct on these points, they do not answer Sun Well's argument and authority.

Implicit in Berkley's reply argument is a distinction between (1) its Coverage Letter in relation to the pre-suit claim for the Occurrence and (2) how it may have acted if a suit was later tendered about the same Occurrence. Dkt. 67 at 5. But no such distinction is found in the Coverage Letter, and it certainly does not suggest that Berkley's coverage position would be different for a lawsuit related to the same Occurrence.[4] The coverage letter asserts that Berkley does not have liability for the Occurrence regardless of whether Mr. Lawson's conduct was intentional, including asserting that intentional conduct would be excluded from coverage. Dkt. 58-9.[5] There is nothing in the letter indicating to Sun Well that Berkley would defend any lawsuit or pay any claim related to the Occurrence. *Id.*; *see also* Dkt. 68-1 at 19 (Archambault Tr. 82:9-17).[6] Rather, the implication of the letter is that Berkley has no obligation under the Policy related to the Occurrence. Dkt. 58-9 at 1 ("This

---

[4] Berkley argues that the Coverage Letter's reservation of rights and request for additional information leaves the door open. Dkt. 67 at 5. This argument is unavailing. The cited boilerplate language suggests that Berkley's position is final based on the information it has, and Berkley does not appear to have reconsidered its analysis upon securing Mr. Lawson's statement. *See* Dkt. 59-9 at 4 ("Berkley National reserves its right to amend our analysis concerning policy coverage, dependent upon any additional or new information that may be provided for consideration."); Facts, ¶28.

[5] Sun Well's litigation position is, at least in the alternative, that Mr. Lawson is not an "Insured" under the policy and, therefore, his intentional conduct would not be excluded from coverage. Facts, ¶¶D9-D14. The Coverage Letter does not address this theory.

[6] Nor does Berkley point to any term in the Policy that could lead to a circumstance where it had a duty to defend where there was not also a duty to indemnify.

12

correspondence is intended to serve as notification that Berkley National Insurance Co. believes there are no obligations under the referenced policy, regarding this claim for a number of reasons").

The cited legal authorities also foreclose Berkley's argument. In *Phillips*, the Tenth Circuit addressed circumstances beyond an explicit denial, noting that under the same principle an "insurer's conduct could lead an insured to believe that benefits would not be forfeited, estopping the insurer from denying benefits even if forfeiture could technically be claimed under the express terms of the insurance contract." *Phillips*, 263 F.3d at 1223 (citation omitted).[7] That is, if the insurer leads the insured to believe that its actions cannot lead to a loss of benefits, such as by indicating that there are no benefits to be had, the insurer cannot then fall back on related terms to deny coverage. *Id.* The Coverage Letter is sufficient to raise a genuine issue of material fact as to whether Berkley led Sun Well to believe that Berkley had denied coverage in relation to the Occurrence.

## 2. Failure to Tender the SME Lawsuit

Sun Well asserts that Berkley's alleged denial of coverage by the Coverage Letter also bars Berkley from denying coverage due to a failure to tender the SME Lawsuit. Dkt. 65 at 18-19. Because the Court finds that Sun Well has raised a

---

[7] This decision discuses Oklahoma state law. Nonetheless, neither party identifies the law that applies or asserts that the same principle would not apply under the relevant law. *See* Facts, ¶D15.

genuine issue of material fact on this issue, the Court finds that Berkley cannot prevail on this argument as well. Accordingly, summary judgment is denied on Sun Well's claim for a declaration of coverage and for breach of contract.

### 3. Bad Faith Claims

Likewise, Berkley's request for summary judgment on Sun Well's bad faith claims relies on the Court granting summary judgment on Sun Well's other claims. Dkt. 57 at 20-21 ("Because [Berkley] did not have a duty to defend or indemnity Sun Well, it cannot be liable for common law or statutory bad faith claims and is entitled to summary judgment in its favor on Sun Well's bad faith claims."). Because the Court has denied summary judgment on Sun Well's other claims, it also denies summary judgment on Sun Well's bad faith claims.

*   *   *

For the reasons shared above, the Court finds that there are disputes of material fact that prevent granting summary judgment.

Accordingly, IT IS ORDERED that Berkley's Motion for Summary Judgment (Dkt. 57) is DENIED.

DATED: August 1, 2024.

BY THE COURT:

S. Kato Crews
United States District Judge

14